STATE of Minnesota, Respondent,

v.

Dontaro Lashaun RIDDLEY,
Appellant.

No. A08–1018.

Supreme Court of Minnesota.

Nov. 25, 2009.

Lawrence Hammerling, Chief Appellate Public Defender, Jodie L. Carlson, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Alan J. Harris, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

On March 19, 2008, appellant Dontaro Riddley was convicted of first-degree premeditated murder and first-degree murder committed during the commission of an aggravated robbery. The Hennepin County District Court sentenced Riddley to two concurrent life sentences without the possibility of parole. Riddley filed this direct appeal seeking to overturn his convictions. On appeal, Riddley argues that: (1) the district court improperly admitted evidence of other crimes, and (2) the district court improperly dismissed a juror for cause. We affirm.

At about 10:30 p.m. on April 17, 2007, Richard Christianson and Michael Trinity were shot and killed in the course of a robbery in North Minneapolis. Earlier that night, Christianson and Trinity had walked to Waldo's Bar & Grill. On their way home, the men were apparently forced to their knees, had their shoes and socks taken off, and were robbed. The men were later found dead in the alley behind the 4700 block of North 6th Street. Both men died from a single gunshot wound to the head. The State charged two men in connection with the murders—Deonsae Guilmant and appellant Dontaro Riddley.

On May 3, 2007, a grand jury indicted Riddley on four counts: (1) first-degree premeditated murder for the death of Christianson, Minn.Stat. § 609.185(a)(1) (2008); (2) first-degree premeditated murder for the death of Trinity, Minn.Stat. § 609.185(a)(1); (3) first-degree murder of Christianson committed during the commission of an aggravated robbery, Minn. Stat. § 609.185(a)(3) (2008); and (4) first-degree murder of Trinity committed during the commission of an aggravated robbery, Minn.Stat. 609.185(a)(3). Riddley's jury trial began on February 19, 2008, in

Hennepin County District Court.[1]

Over the course of the jury trial, the State presented evidence of the following events. On the evening of April 17, 2007, Guilmant was at the home of Mattea Thurman—his girlfriend and the mother of his child. At that time, Thurman was living with her mother, who lived in the 4700 block of North 6th Street, Minneapolis. Thurman's mother asked Guilmant and Thurman to walk to a convenience store to buy her some candy. Thurman testified that she was carrying a gun with her when she and Guilmant walked to the convenience store, and that the gun belonged to her but she and Guilmant "kept" the gun together. While at the convenience store, Thurman and Guilmant saw Riddley, who Thurman knew by the name D–Loc. Thurman knew Riddley from around the neighborhood and because he was the boyfriend of one of Thurman's friends.

Thurman, Guilmant, and Riddley left the convenience store together. Thurman said that she gave Riddley the gun she was carrying. Thurman was wearing a dark coat with fur trim around the hood, Guilmant was wearing a dark jacket with white and red markings, and Riddley was wearing a black hooded sweatshirt. Thurman, Guilmant, and Riddley walked north through the alley between Camden and Lyndale Avenues. When the three individuals were near Waldo's Bar & Grill, they saw a white male in the alley walking toward Waldo's.

The white male was R.S., who had been at his friend J.S.'s house located in the 4700 block of Aldrich Avenue helping with some remodeling work. At about 10:00 p.m., R.S. decided to walk to Waldo's using a shortcut through the alley. R.S. testified that when he entered the alley behind

Waldo's, he saw three people—one female and two males—who began to walk toward him. According to R.S., the female and one male walked down the west side of the alley while the male wearing a black hooded sweatshirt walked down the east side. R.S. testified that the male in the hooded sweatshirt suddenly sprang forward, pointed a gun in R.S.'s face, told R.S. to get down on his knees and turn around, and then cocked the gun twice. R.S. complied and got down on his knees. R.S. described the gun used by the male in the hooded sweatshirt as a black revolver. R.S. said that the two people behind him removed his shoes and searched through his pockets. They took his wallet and a Leatherman tool he was carrying. At trial, Thurman identified Riddley as the male in the hooded sweatshirt who had the gun and stated that she and Guilmant had been the two people walking on the west side of the alley.

When Thurman, Guilmant, and Riddley determined that R.S. had no cash or valuables, Thurman told him to leave. R.S. picked up his shoes and coat and ran back to J.S.'s house. When he arrived at the house, J.S. called 911 at 10:11 p.m. During the 911 call, R.S. told the 911 dispatcher he had been robbed by two black males and a black female. R.S. was not able to identify any of his assailants, although he did say that the man with the gun was wearing a black hooded sweatshirt and that the female had on a nylon coat with fur trim around the collar. The dispatcher told R.S. and J.S. that the police were being dispatched to J.S.'s address, and the two men then waited in front of the house for the police to arrive.

After robbing R.S., Thurman, Guilmant, and Riddley continued to walk around the

---

1. The State tried Guilmant and Riddley separately. Guilmant, who was a juvenile at the time of the crime, was certified as an adult and convicted of two counts of second-degree murder on November 19, 2007. Guilmant testified at Riddley's trial.

neighborhood. According to Thurman, Riddley walked away from the other two at one point, then returned several minutes later with a pair of pants and two different sized pairs of shoes. Thurman testified that she took the shoes and that they were a pair of Nike Air Forces and a pair of Pumas. Thurman said that after the group arrived at the alley in the 4700 block, between 6th Street and Camden Avenue, two men were walking toward them. According to Thurman, Riddley stated that he intended to rob the two men. Thurman testified that, at this point, she separated from Guilmant and Riddley, cutting through the adjoining properties to reach the sidewalk on Camden Avenue. Shortly after walking away, Thurman heard two gunshots in quick succession. She looked back toward the alley and saw Riddley making a kicking motion with his foot, although she could not see what he was kicking. Thurman said that she continued to walk toward a house in the 4700 block of Aldrich Avenue North where two of her friends, C.A. and E.M., lived.

Meanwhile, R.S. and J.S. heard gunshots while they were waiting for the police to arrive, so they quickly went inside the house. R.S. believed that his assailants may have tracked him back to his friend's house, so he secured the home. J.S. called 911 again, and this call was registered at 10:28 p.m. As J.S. was talking to the 911 dispatcher, J.S. saw two black males run across his property. At trial, J.S. explained that his yard was unfenced and provided the only passage between the alley where the shooting occurred and the 4700 block of Aldrich Avenue. J.S. testified that the first male was taller and wore a jacket with red details on it. The second male was shorter and had on a black hooded sweatshirt. J.S. stayed on the phone until the police arrived.

Thurman testified that when she arrived at C.A. and E.M.'s house, she found Guilmant in the backyard. Guilmant told Thurman that "Riddley shot him." Riddley arrived moments later, and he told Thurman the shooting was an accident. Thurman, Guilmant, and Riddley then went into the house. Thurman went into the bedroom that C.A. and E.M. shared, carrying two pairs of shoes. C.A. and E.M. testified that when they followed Thurman out of the bedroom, Guilmant and Riddley were in the bathroom together. Thurman began pacing around the main room of the house. E.M. described Thurman as being in an agitated state and said she repeatedly asked Thurman what was wrong. Riddley, Guilmant, and Thurman then left the house together and walked out to the backyard. C.A. and E.M. watched from the house as Thurman, Guilmant, and Riddley disposed of several items in the backyard trash cans.

Thurman testified that she disposed of the pair of pants, two pairs of shoes, and Guilmant's jacket in the trash cans behind C.A. and E.M.'s house. After disposing of these items, Thurman, Guilmant, and Riddley left through the alley. At some point, Riddley separated from Guilmant and Thurman. Thurman and Guilmant decided to walk back to the alley behind Thurman's home, where the shooting had occurred. There, Thurman and Guilmant found two men dead in the alley. At about 11 p.m., Thurman called 911 and told the dispatcher that she had found two bodies in the alley. Thurman and Guilmant were still in the alley when the police arrived shortly thereafter.

The police put Thurman and Guilmant into squad cars as they secured the scene and collected evidence. Sometime around 1 a.m., Thurman and Guilmant were taken in separate cars to the police station for questioning. When questioned by the po-

lice, both Thurman and Guilmant claimed to have no knowledge of the murders. While questioning Thurman and Guilmant, the officers conducting the interrogation received information from the officers at the crime scene that numerous footprints with circular tread patterns consistent with Nike Air Forces were found around the bodies. One of the officers noticed that both Thurman and Guilmant were wearing Nikes. Using this information, the officer obtained a search warrant for Thurman and Guilmant's clothing and seized the clothing. The officers' questioning of Thurman and Guilmant ended at around 4 a.m.

At about 5 a.m., the officers investigating the crime received information from someone at the police crime lab that, during an inventory of Guilmant's clothes, a live .38 caliber bullet was found in the pocket of his pants. The bullet was the same caliber as the bullets found at the crime scene. The police immediately brought Thurman and Guilmant back to the police station for further questioning. At this point, the police began a more focused interrogation of Thurman, suggesting they did not believe her story. Eventually Thurman admitted to knowing about the deaths before making the 911 call to the police, and she told the police that the shooter was a person she knew by the name D–Loc. After some further investigation, the police were able to determine that D–Loc was Riddley. The police then located Riddley and took him into custody on April 18. When questioned, Riddley told the police that Guilmant had asked him to take the gun. The officers asked if Riddley would take them to the gun and he agreed. The officers and Riddley traveled to the house where he was arrested. The police conducted a search of the house where Riddley was arrested and found a black .38 revolver under Riddley's mattress.

While in custody, Riddley also told the police about the items deposited in the trash cans behind C.A. and E.M.'s house. The police followed up on Riddley's information. Among the items found in the trash cans were: Guilmant's jacket, two pairs of shoes, medical papers with Guilmant's name on them, and Trinity's California driver's license. The police also talked with C.A. and E.M., who told them that Thurman, Guilmant, and Riddley had been at their house the night Christianson and Trinity were shot. C.A. and E.M. also told the police that Riddley had returned to their house again about 15 minutes after leaving with Thurman and Guilmant. During the second visit, Riddley told C.A. and E.M. that he had shot two men. Riddley explained that he had only intended to rob the men. But he said that one man had moved, and Riddley thought he saw a badge and gun. Riddley said that this movement startled him, and he shot the man "on accident." Riddley said he then shot the second man because he did not want any witnesses.

On March 11, 2008, the jury found Riddley guilty of first-degree premeditated murder for the death of Christianson; second-degree intentional murder for the death of Trinity; and two counts of first-degree murder committed in the commission of an aggravated robbery for the deaths of both Christianson and Trinity. On March 19, 2008, the district court convicted Riddley of first-degree premeditated murder and first-degree murder committed during the commission of an aggravated robbery and sentenced him to two concurrent life sentences without the possibility of parole.

Riddley filed a direct appeal to our court, and he raises two issues. First, Riddley argues that the district court improperly admitted *Spreigl* evidence of the

R.S. robbery and evidence pertaining to the two pairs of shoes given to Thurman by Riddley. Second, Riddley argues that the district court improperly granted the State's motion to dismiss a prospective juror for cause.

## I.

■ Riddley first argues that the district court erred in admitting testimony regarding the R.S. robbery and the acquisition of two pairs of shoes. During pretrial arguments, the State made an offer of proof as to the evidence it intended to introduce relating to the R.S. robbery and shoes acquisition. The State argued that it should be allowed to submit evidence of the prior acts because they were part of the "same course of conduct that went on [that] evening that resulted in the death of two men." The State contended that because the evidence was a part of the course of conduct that night, it was not *Spreigl* evidence and not subject to Minnesota Rule of Evidence 404(b).

Riddley argued that the evidence was being presented as immediate-episode evidence only because the State had failed to comply with the *Spreigl* notice requirement. Riddley contended that the State failed to prove that the evidence of the prior acts qualified as immediate-episode evidence because "for one, these prior acts, they are not charged, and two, they are easily separable." Riddley also argued against admission of the R.S. robbery and shoes acquisition evidence on the ground that it was being offered for propensity purposes in violation of Minn. R. Evid. 404(b).

The district court concluded that testimony regarding the R.S. robbery was admissible as immediate-episode evidence and therefore outside of the *Spreigl* notice requirement. The court then determined that it was not necessary to perform a

Rule 404(b) analysis in deciding whether to admit this evidence. Instead, the court considered whether the probative value of the evidence substantially outweighed the risk of unfair prejudice under Rule 403. The court admitted the evidence, concluding that the probative value of the evidence on the issues of identity, motive, and possession of the gun outweighed any risk of unfair prejudice to Riddley.

On appeal, Riddley argues that the district court erred when it concluded the R.S. robbery was immediate-episode evidence and allowed shoes acquisition evidence to be presented at trial.

### A. Immediate–Episode Evidence

■ The abuse of discretion standard controls our review of the district court's decision to admit testimony regarding the R.S. robbery and shoes acquisition. *See State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998) ("Absent a clear abuse of discretion, evidentiary rulings generally rest within the trial court's discretion."). A defendant appealing the admission of evidence has the burden to show the admission was both erroneous and prejudicial. *Id.* (citing *State v. Steinbuch*, 514 N.W.2d 793, 799 (Minn.1994)).

Minnesota has long adhered to the common-law rule excluding evidence of prior bad acts except where the evidence fits within a specific exception. *See State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). Although other bad acts evidence is often probative, it also carries a great likelihood of inflaming passions and resulting in unfair prejudice to the defendant. *See McCormick on Evidence* § 190 at 797–98, 811 (John William Strong, ed., 4th ed. 1992). As we said in *Spreigl*,

That such former misconduct is relevant, i.e. has probative value to persuade us of the general trait or disposition, cannot be doubted. The assumption of

its probative value is made throughout the judicial opinions on this subject.... It may almost be said that it is because of this indubitable relevancy of such evidence that it is excluded.... The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. Moreover, use of alleged particular acts ranging over the entire period of the defendant's life makes it impossible for him to be prepared to refute the charge, any or all of which may be mere fabrications.

272 Minn. at 495–96, 139 N.W.2d at 172 (citing 1 Wigmore, *Evidence* §§ 193, 194 (3d ed. 1940)). Because of the danger that evidence of other bad acts will be used improperly to convict a defendant based on character, the safeguards now set forth in Rule 404(b) were developed to govern admission of other acts evidence. *See State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284–85 (1967); *Spreigl*, 272 Minn. at 496–97, 139 N.W.2d at 172–73.

Immediate-episode evidence is a narrow exception to the general character evidence rule. In *State v. Wofford*, we explained that "the rule excluding evidence of the commission of other offenses does not necessarily deprive the state of the right to make out its whole case against the accused on any evidence which is otherwise relevant upon the issue of the defendant's guilt of the crime with which he was charged." 262 Minn. 112, 118, 114 N.W.2d 267, 271 (1962). Rather, "[t]he state may prove all relevant facts and circumstances which tend to establish any of the elements of the offense with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes." *Id.* We further explained that immediate episode evidence is admissible "where two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other, or where evidence of other crimes constitutes part of the res gestae." *Id.*[2]

Applying the analysis developed in *Wofford*, we have repeatedly affirmed the admission of immediate-episode evidence when there is a close causal and temporal connection between the prior bad act and the charged crime.[3] We concluded in

---

**2.** "Res gestae" means "[t]he events at issue, or other events contemporaneous with them." *Black's Law Dictionary* 1423 (9th ed.). It is a term that has fallen out of favor. *See id.* (citing John H. Wigmore, *A Students' Textbook of the Law of Evidence* 279 (1935)).

**3.** In *State v. Walsh*, we did not need to discuss the immediate-episode exception because the district court admitted as *Spreigl* evidence testimony regarding Walsh's aggressive conduct toward a waitress at the bar where Walsh consumed alcohol before murdering another woman in her home later that same evening. 495 N.W.2d 602, 606 (Minn.1993). Nonetheless, we stated that, "[a]rguably, the waitress incident was admissible as part of the occurrence or episode out of which the offense charges against the defendant arose." *Id.*

(internal quotation marks omitted) (citing Minn. R.Crim. P. 7.02; *State v. Johnson*, 322 N.W.2d 220, 222 (Minn.1982)). Quoting *McCormick on Evidence* § 190, at 558 (Edward W. Cleary ed., 3d ed. 1984), we explained that the waitress incident helped to "complete the story of the crime by placing it in context of nearby and nearly contemporaneous happenings." *Walsh*, 495 N.W.2d at 606. While our decision in *Walsh* does not discuss what, if any, causal connection there may have been between the waitress incident and murder, we do not read *Walsh* as eliminating the need for a close causal connection between the prior bad act and the charged crime; especially, when *McCormick* § 190, at 558 n.11, notes that "complete story" rationale does not allow the admission of evidence

*State v. Martin,* 293 Minn. 116, 128, 197 N.W.2d 219, 226–27 (1972), that the district court properly admitted testimony regarding earlier robberies committed by the defendant because the defendant's desire to conceal the earlier robberies motivated the charged murder. In *State v. Leecy,* we explained that testimony about earlier threats constituted immediate-episode evidence because the earlier threats escalated into the charged assault. 294 N.W.2d 280, 282 (Minn.1980). We held in *State v. Darveaux* that evidence of drugs found in the defendant's purse two days after drug store robbery was admissible as immediate-episode evidence where the drugs were the same type of drugs stolen from the drug store. 318 N.W.2d 44, 48 (Minn. 1982). More recently, we concluded in *State v. Nunn* that testimony regarding an earlier kidnapping was immediate-episode evidence because the defendant obtained information during the earlier kidnapping that motivated the charged murder. 561 N.W.2d 902, 907–08 (Minn.1997). Our decisions in these cases illustrate the type of close causal and temporal connection required to satisfy the narrow immediate-episode exception to the general character evidence rule.

We have also discussed immediate-episode evidence when considering whether a district court's decision to join two offenses for trial prejudiced the defendant. In *State v. Kendell,* we held that joinder did not unfairly prejudice the defendant when the evidence of the joined offense would have been admissible in a separate trial as immediate-episode evidence because there was a temporal and causal connection between the two offenses. 723 N.W.2d 597, 608 (Minn.2006). In *Kendell,* testimony regarding a murder committed in unit 303 constituted immediate-episode evidence

because the unit–303 murder was committed to avoid apprehension for the murders committed next door in unit 304. *See id.*

Our most recent discussion of immediate-episode evidence, *State v. Fardan,* emphasizes the need for a close causal and temporal connection between the prior bad act and the charged crime. 773 N.W.2d 303, 316 (2009). In *Fardan,* the defendant was charged with first-degree murder. *Id.* at 311. The district court admitted evidence of several other offenses the defendant committed on the night of the murder as immediate-episode evidence because the crimes were all committed within a short time frame by the same group of men. *See id.* at 312, 316. We disagreed, explaining that the other crime evidence was not immediate-episode evidence because the "murder was not committed to facilitate the other offenses, and the other offenses were not committed to facilitate [the] murder." *Id.* at 317. While "the identity of the perpetrators of all of the offenses was the same," and the other offenses and the murder "were all committed as part of the same broad plan to commit robbery," we said that "this limited connection is not sufficient to make the other offenses part of the 'immediate episode' of [the deceased's] robbery and murder." *Id.*

In Riddley's case, there is a close connection in terms of the time and location between the charged offenses and the R.S. robbery and shoes acquisition. *See Wofford,* 262 Minn. at 118, 114 N.W.2d at 271 (stating that "where two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without providing the other ... [the evidence of the prior crime] is admissible.") The prior acts and the charged crimes took place within a short time of each other—no more than 15 minutes

that is merely temporally related to the charged crime. Therefore, we conclude our

discussion of immediate-episode evidence in *Walsh* is fairly characterized as dicta.

apart. The prior acts and the charged crimes also took place in and around the same location—in alleys within one block of each other.

But, there is not a close causal connection between the charged offenses and the R.S. robbery and shoes acquisition. There is no evidence that the murders were motivated by the R.S. robbery or that the murders were committed to conceal the R.S. robbery. In addition, the police did not find evidence relating to the murders at the site of the R.S. robbery. Because the R.S. robbery and shoes acquisition did not have a close causal connection to the charged murders, we conclude the district court abused its discretion when it concluded that testimony regarding the R.S. robbery and shoes acquisition was immediate-episode evidence.

 Our conclusion that the district court abused its discretion when it admitted testimony regarding the R.S. robbery and shoes acquisition does not end our analysis. A defendant appealing the admission of other crimes evidence must also demonstrate that the erroneous admission of evidence created "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Ness*, 707 N.W.2d 676, 691 (Minn.2006).

We have said that, "[t]he underlying purpose of the Spreigl notice is to avoid surprise to the defendant by giving him time to prepare a defense to the charges." *State v. Grilli*, 304 Minn. 80, 86, 230 N.W.2d 445, 450 (1975); *see also State v. Bolte*, 530 N.W.2d 191, 197 (Minn.1995) ("The notice requirement is designed to give a defendant sufficient opportunity to prepare for trial and to avoid situations where a defendant must defend against unexpected testimony regarding prior offenses."). In *Bolte*, we held that the State's failure to provide the defendant formal *Spreigl* notice did not prejudice the defendant when the State did not discover the relevance of the evidence until after the trial began, the police reports alluded to the *Spreigl* evidence, and it appeared that the defendant intended to call the *Spreigl* victim as a witness at trial. 530 N.W.2d at 199.

Here, the complaint included detailed allegations about the R.S. robbery. Riddley had actual knowledge of the R.S. robbery allegation, as evidenced by his pretrial motion to prohibit "the State from introducing evidence of a prior robbery occurring on the date of the offense." In response to Riddley's pretrial motion, the State described both the R.S. robbery and shoes acquisition in detail and on the record and asserted the two incidents were part of the chronology of events on the evening of the murder. The State also included R.S. on its list of potential trial witnesses. Riddley did not argue to the district court, nor does he argue on appeal, that he was not aware of the facts of the R.S. robbery and shoes acquisition. Riddley asserted in the district court that the lack of notice affected his trial preparation. However, Riddley did not articulate to the district court, nor does he articulate on appeal, how the lack of formal *Spreigl* notice adversely affected his trial preparation or what he might have done differently had he received formal notice.[4] Based on the record in this case, we conclude that Riddley has failed to demonstrate that the

---

4. Unlike the defendant in *State v. Doughman*, Riddley did not detrimentally rely on a pretrial court order excluding the *Spreigl* evidence, nor does the record suggest that Riddley was denied an opportunity to gather

evidence to rebut the testimony of R.S. or investigate the facts of the R.S. robbery and shoes acquisition. 384 N.W.2d 450, 455 (Minn.1986).

lack of formal *Spreigl* notice prejudiced him.

■ In determining whether the erroneous admission of other crimes evidence significantly affected the verdict, we have considered whether the State presented other evidence on the issue for which the other crime evidence was offered. *State v. Courtney*, 696 N.W.2d 73, 84 (Minn.2005). We have also considered whether the district court "instructed the jury to limit the use of the other crime evidence and not to convict [the defendant] based on that evidence." *Id.* We presume a jury follows a court's cautionary instruction. *Id.* Other relevant considerations are whether the State dwelled on the evidence in closing argument and whether the evidence of guilt was overwhelming. *Bolte*, 530 N.W.2d at 198.

Here, the State offered the testimony regarding the R.S. robbery and shoes acquisition to prove identity, motive, and possession of the gun. C.A., E.M., and Thurman provided additional direct testimony on these issues. The district court also gave the jury a cautionary instruction regarding the R.S. robbery. Although the 911 call reporting the R.S. robbery was played for the jury during the State's case-in-chief and again in closing argument, the evidence of Riddley's guilt is significant. In addition, the R.S. robbery and shoes acquisition evidence was not graphic or inflammatory. Nor was the evidence likely to lead to a conviction based on propensity because the jury was likely to see the evidence "as parts of a whole and if [the jury was going to] believe or disbelieve [the defendant's] doing of one part, [it would] believe or disbelieve his doing of all." IA *Wigmore on Evidence* § 218 (Tillers rev. 1983). Thus, we conclude that Riddley failed to demonstrate that the erroneous admission of testimony regarding the R.S. robbery and the shoes acquisition significantly affected the verdict.

B. Immediate–Episode Evidence Standard

On appeal, Riddley also contends that if the evidence of R.S.'s robbery and shoe acquisition is immediate-episode evidence, the district court erred by admitting the evidence without ensuring that the State had met the admissibility requirements for the other crimes evidence as set forth in Minn. R. Evid. 404(b). At the crux of Riddley's argument is the legal issue of whether immediate-episode evidence should be treated as Rule 404(b) bad acts evidence or whether, alternatively, the evidence should be admitted under a more general 403 analysis. Having concluded that the evidence of the R.S. robbery and shoes acquisition was not immediate-episode evidence, we need not reach the issue of what standard should be applied to the immediate-episode evidence.

II.

■ Riddley also argues that the district court erred in granting the State's request to dismiss a veniremember for cause. The veniremember, J.S., is an African–American woman.[5] J.S.'s questionnaire revealed that her brother had been shot and killed by a Minneapolis police officer 15 years earlier. During the voir dire process, J.S. also informed the court that one of the prosecuting attorneys had prosecuted her son in juvenile court.

When questioned about her connection to the prosecuting attorney, J.S. said she was not happy about how her son's case was handled. She also said that her son was still in detention as result of the offense, which "all stems to working with

---

**5.** Riddley is also African–American, and both the victims were Caucasian.

[the prosecuting attorney]." J.S. admitted that the juvenile court hearings concerning her son had become emotional and heated. Further, J.S. acknowledged that her son was still in detention, as an "extended jurisdiction juvenile," and that it was possible the prosecuting attorney could be involved in future proceedings with her family regarding her son's case. But J.S. also stated that she believed her experience with the prosecuting attorney would not affect her jury service. J.S. stated that despite her previous contact with the prosecuting attorney, she could still find Riddley guilty if the State proved its case against him beyond a reasonable doubt. But when asked if her involvement with her son's case would cause her to distrust the prosecuting attorney, J.S. responded, "I can't say that now."

In talking about her brother's death, J.S. indicated police officers had mistaken a butter knife for a weapon, and that the police shot "and killed, not to injure." When asked by defense counsel, J.S. said she saw the police every day and she understood that there are good police officers and bad ones. When asked her opinion about the officer who shot her brother, J.S. said that "I would say I don't feel—I don't even know if they are on the police force anymore." However, J.S. said that she could be fair to both sides in the trial because "the facts are the facts, and that's all I would have to go on."

The State moved to have J.S. dismissed for cause based on the adversarial relationship between the prosecuting attorney and J.S. over her son—a matter that the State noted was very personal to J.S. Riddley argued that because the police focus on communities where African–Americans live, eliminating people of color based on experiences with the police or crime has a disparate impact on minorities and prevents significant minority representation on juries. Riddley also argued that J.S. would likely be friendly to the State as a result of her son, in hopes of placating the prosecutor, rather than doing something that would make the State hostile. Finally, Riddley argued that J.S. had represented that she could be fair.

The district court found sufficient grounds for cause, and granted the State's motion to dismiss for cause. The court's decision was based on J.S.'s experience with her brother and her interaction with the prosecutor in the case. On appeal, Riddley argues that the court erred in granting the State's motion to dismiss J.S. for cause because Riddley had established that J.S. had an unbiased state of mind. Further, Riddley urges us to apply the *Batson* analysis to cause challenges, and argues that under such an analysis the dismissal of J.S. was discriminatory.

Under Minn. R.Crim. P. 26.02, subd. 5, a veniremember may be challenged for cause if the veniremember's state of mind "satisfies the court that the [veniremember] cannot try the case impartially and without prejudice to the substantial rights of the party challenging." In *State v. Logan*, we explained that when the veniremember admits to such a state of mind, then the veniremember should be excused unless the he or she is "rehabilitated." 535 N.W.2d 320, 323 (Minn.1995) (citing 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 21.3(c) at 729–30 (1984)). We noted that rehabilitation typically "takes the form of the [veniremember] stating unequivocally that he/she will follow the trial court's instructions and will fairly evaluate the evidence." *Id.* Further, we said that "most judges, when faced with such an unequivocal assertion, 'will accept the statement at face value.' " *Id.* (quoting LaFave & Israel, *Criminal Procedure* § 21.3(c) at 730).

■ Generally, the district court's determination on whether veniremember's "protestation of impartiality is believable is entitled to 'special deference' because 'the determination ... is one of demeanor.'" *Id.* (quoting *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). The court may bear in mind that veniremembers "'may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed,'" and the court "is free to believe 'those statements that were the most fully articulated or that appeared to have been least influenced by leading.'" *Id.* at 323–24 (quoting *Patton,* 467 U.S. at 1039, 104 S.Ct. 2885).

On the record before us, we conclude that the district court did not err in granting the State's request that veniremember J.S. be dismissed for cause. The record shows that in response to leading questions, J.S. stated that she would judge the case based on the facts presented and that she could convict Riddley if the State proved its case beyond a reasonable doubt. But J.S. also made several statements suggesting that her experiences may affect her jury service. J.S. admitted she had been unhappy with the prosecuting attorney during her son's juvenile proceedings and acknowledged they had engaged in heated exchanges at that time. She noted that her son was still in detention as a result of that prosecution. And when asked whether there was "anything about what [the prosecuting attorney] did in your son's case which would make you on this case not believe a word that any witness he calls or anything he says is true," J.S. responded that she "can't say that now."

If there are any lingering questions as to whether there was sufficient cause to dismiss J.S., a nexus is found in the arguments made by Riddley before the district court. Riddley argued that J.S. should not

be dismissed because, if anything, J.S. would likely be friendly to the State in hopes of placating the prosecuting attorney. Regardless of whether J.S.'s relationship with the prosecuting attorney would have been helpful or hurtful to the State, the key concern is that J.S.'s experiences may have affected her decision on the merits of Riddley's case. A relationship that would cause J.S. to decide Riddley's case based on a consideration other than evidence introduced at trial—certainly including hopes that a decision favorable to the State would entice the prosecuting attorney to be lenient on her son—provides cause for dismissal. Therefore, given the relationship between the prosecuting attorney and J.S. and the mixed tenor of J.S.'s answers on the record, and taking into account the "special deference" given to a district court's determination on whether the veniremember's "protestation of impartiality is believable," we conclude the court did not err in dismissing J.S. for cause.

Riddley also urges us to extend *Batson*-type inquiries to cause challenges and argues that, if we did so, the dismissal of J.S. would constitute a *Batson* violation. In *Batson v. Kentucky,* 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that permitting the State to use its preemptory challenges to exclude members of defendant's race for racially discriminatory reasons violated the defendant's equal protection rights. *Batson* developed a burden shifting test, *see id.* at 96–97, 106 S.Ct. 1712, which we have incorporated into our Rules of Criminal Procedure, *see* Minn. R.Crim. P. 26.02, subd. 6a.

Under Minnesota's Rules of Criminal Procedure, to establish a claim that the State's use of a preemptory challenge was racially motivated, the defendant must first make out a prima facie case demon-

strating that the State excluded venire-members on account of their race. Minn. R.Crim. P. 26.02, subd. 6a(3). Once the defendant has established a prima facie case, the burden shifts to the State to offer a racially neutral explanation for the challenge. *Id.* Finally, if the State offers a racially neutral explanation, the district court will allow the strike unless the defendant is able to show that the State's proffered reason is pretextual. *Id.*

Riddley asks us to extend the framework of our *Batson* analysis to dismissals for cause. We considered the extension of *Batson* to cause challenges in *State v. Bowers.* 482 N.W.2d 774, 776–78 (Minn. 1992). Because a veniremember can be stricken for cause only if the State has shown that "the juror cannot try the case impartially and without prejudice," we concluded in *Bowers* that if the State has "demonstrated that a challenge for cause is necessary, then *a fortiori* the prosecutor has met the standard required for *Batson.*" *Id.* at 776. We did acknowledge that "a rare case" could arise if "the facts undoubtedly suggest that the prosecutor has challenged for cause a juror for racially discriminatory reasons, and the trial court has erred in granting the motion." *Id.* Because we have concluded that the district court did not err in granting the State's motion to dismiss J.S. for cause, we further conclude that Riddley has not presented that "rare case" in which we would consider whether a *Batson*-type inquiry should be applied to dismissals for cause.

For all the foregoing reasons, we hold that the district court did not err in granting the State's motion to dismiss venire-member J.S. for cause.

Affirmed.