*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1899**

State of Minnesota,
Respondent,

vs.

Nathaniel Donald Beulah,
Appellant.

**Filed August 1, 2016
Affirmed
Johnson, Judge**

Hennepin County District Court
File No. 27-CR-13-39779

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Daniel Guerrero, Meshbesher & Spence, Ltd., Minneapolis, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Ross, Judge; and Johnson, Judge.

**UNPUBLISHED OPINION**

**JOHNSON**, Judge

A Hennepin County jury found Nathaniel Donnie Beulah[1] guilty of first-degree criminal sexual conduct based on evidence that he sexually abused a stepgranddaughter. Beulah argues that the district court erred by admitting *Spreigl* evidence at trial and by denying his motion for a downward dispositional departure at sentencing. We affirm.

**FACTS**

Between 1999 and 2003, Beulah and C.T. lived together in a home in Minneapolis. Several of Beulah's children, C.T.'s children, and their joint children lived in the home during that period of time. Other relatives and friends were frequent visitors and overnight guests.

In 2013, Beulah was accused of sexually abusing two girls who lived in his home years earlier. One of those girls is J.T., who was a stepdaughter of a son of C.T. J.T. moved into Beulah's home with her mother, stepfather, and younger brother in 1999, when she was five years old. J.T. and her three family members moved out in 2000 into a home that was a short distance away. Beulah and C.T. continued to care for J.T. before and after school, on some weekends, and during the summertime, until J.T. was nine or ten years old. J.T. viewed Beulah as a grandfather and often stayed overnight in Beulah's home.

---

[1]The record indicates that appellant's middle name actually is Donnie, even though the caption of the complaint says Donald. Before trial, the state moved to amend the complaint to identify Beulah as Nathaniel Donnie Beulah, and the district court granted the motion. But the district court continued to use the original caption in its subsequent orders, and this court's caption follows the district court caption.

J.T. testified at trial that Beulah began sexually abusing her in 2000 when she was approximately five years old. The first incident of sexual abuse that she remembers occurred when she stayed at Beulah's home for an overnight visit while her mother was away. She was lying on a mattress on the main level of the home when Beulah entered the room, sat next to her, and touched her vagina with his hand. The last incident of sexual abuse that J.T. remembers occurred in approximately 2003, when she was eight or nine years old. Beulah brought J.T. downstairs to his basement bathroom, which was connected to his bedroom. Beulah removed her clothes and rubbed his penis on her vagina. J.T. believes that Beulah tried to insert his penis into her vagina but was interrupted by a knock on the bedroom door. Beulah sexually abused J.T. frequently in between the first and last incidents by touching her chest and vagina, both over and under her clothes. Although Beulah's basement bedroom generally was off limits to all others, Beulah often lured J.T. to the basement by offering her money, candy, or a treat. The abuse often occurred when Beulah was the only adult at home. If other persons were present in the home, they were upstairs on the main level or the upper level. J.T. did not tell anyone about the abuse because she was afraid that Beulah would hurt her or her family.

Beulah also was accused of sexually abusing J.B., who is C.T.'s daughter. J.B. moved into Beulah's home as an infant and lived there throughout her childhood. During the period when she was sexually abused, J.B. lived with her mother, Beulah, four siblings, and several other persons. J.B. moved out in 2003 or 2004, when she was 18 or 19 years old, after she told Beulah that she would move out of the home if he did not move out.

3

J.B. testified at trial that, at the time Beulah sexually abused her, she believed that he was her biological father. When J.B. was 13, Beulah told her that he wanted to teach her about sex. Beulah typically sexually abused her in the afternoon, when her mother was at work. The abuse often occurred while she and Beulah were watching television in Beulah's bedroom. Beulah often would remove her clothing and touch her vagina with his hands. The abuse intensified until Beulah touched her vagina with his penis. The sexual abuse ended when J.B. refused to go into Beulah's bedroom with him. J.B. told no one about the abuse because Beulah "asked [her] not to." J.B. also testified that she once entered Beulah's bedroom and saw Beulah on top of J.T.

In April 2013, an event triggered J.T.'s memory of her sexual abuse. After discussing the issue with her mother, J.T. reported the abuse to the police. Shortly thereafter, J.T.'s mother spoke with J.B. about J.T.'s report. As a result of that conversation, J.B. reported to the police that Beulah also had sexually abused her on multiple occasions in 1998 and 1999, when she was approximately 13 and 14 years old.

In December 2013, the state charged Beulah in a single complaint with criminal conduct toward both J.T. and J.B. The complaint alleged three offenses: (1) first-degree criminal sexual conduct toward J.B., in violation of Minn. Stat. § 609.342, subd. 1(a) (1998); (2) first-degree criminal sexual conduct toward J.T., in violation of Minn. Stat. § 609.342, subd. 1(a) (2002); and (3) second-degree criminal sexual conduct toward J.B., in violation of Minn. Stat. § 609.343, subd. 1(b) (1998).

In July 2014, Beulah moved to sever counts 1 and 3 from count 2. The district court granted the motion. This appeal is concerned solely with subsequent proceedings on count 2, which alleged criminal sexual conduct toward J.T.

Before trial, the state moved to admit *Spreigl* evidence of Beulah's alleged sexual abuse of J.B. to show Beulah's intent, absence of mistake, and common scheme or plan with respect to J.T. Beulah opposed the state's motion. At the outset of trial, the district court granted the state's motion, thereby allowing J.B. to testify that Beulah had sexually abused her.

The case was tried to a jury on seven days in July 2015. The state called five witnesses: J.T., J.B., J.T.'s mother, C.T., and a police sergeant. Beulah testified at trial and denied sexually abusing either J.T. or J.B. Beulah also called six other witnesses: four of his children, a former girlfriend of one of his children, and a crime-scene investigator. The jury found Beulah guilty of first-degree criminal sexual conduct toward J.T.

Before sentencing, Beulah moved for a downward dispositional departure from the presumptive guidelines sentencing range. The district court denied the motion and imposed a presumptive sentence of 48 months of imprisonment. Beulah appeals.

## D E C I S I O N

### I. *Spreigl* Evidence

Beulah argues that the district court erred by admitting J.B.'s testimony that Beulah sexually abused her when she was a child.

Beulah's argument is governed by a rule of evidence that states, in relevant part:

5

> Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless . . . the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence . . . .

Minn. R. Evid. 404(b). Evidence of other crimes or bad acts may be admissible to prove a common scheme or plan. *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn. 1998). Evidence of other crimes or bad acts is known in Minnesota as "*Spreigl* evidence." *Id.* (citing *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965)). A district court must apply a five-part test to determine whether *Spreigl* evidence is admissible. Minn. R. Evid. 404(b). Such evidence is admissible if:

> 1) the prosecutor gives notice of its intent to admit the evidence consistent with the rules of criminal procedure; 2) the prosecutor clearly indicates what the evidence will be offered to prove; 3) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; 4) the evidence is relevant to the prosecutor's case; and 5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

Minn. R. Evid. 404(b); *see also State v. Ness*, 707 N.W.2d 676, 685-86 (Minn. 2006). This court applies an abuse-of-discretion standard of review to a district court's admission of *Spreigl* evidence. *State v. Clark*, 738 N.W.2d 316, 345 (Minn. 2007).

In this case, there is no dispute that the state has satisfied the first, second, and third requirements of the five-part test. Beulah challenges the admission of the state's *Spreigl* evidence under the fourth and fifth requirements.

6

**A.      Relevance**

Beulah contends that the district court erred by finding that the state's *Spreigl* evidence is relevant to the state's case.

When offering its *Spreigl* evidence, the state asserted that the evidence is relevant to prove Beulah's intent, the absence of mistake, and a common scheme or plan. The district court found the state's *Spreigl* evidence relevant for the asserted purposes. The district court specifically found the *Spreigl* evidence relevant due to similarities between the abuse of J.B. and J.T. in terms of the ages of the victims, the lack of a nearby parent, the escalation from "non-criminal" touching to genital touching, the time frame of the abuse, Beulah's means of coercing compliance, and Beulah's efforts to keep the conduct secret.

We begin by addressing the relevance of the state's *Spreigl* evidence to the common scheme or plan exception. To be relevant under this exception, *Spreigl* evidence must have a "marked similarity in modus operandi to the charged offense." *Ness*, 707 N.W.2d at 687-88. "[I]f the prior crime is simply of the same generic type as the charged offense, it ordinarily should be excluded." *Clark*, 738 N.W.2d at 346 (alteration in original) (quotation omitted). It is well established that, in prosecutions for sexual abuse, *Spreigl* evidence may be admitted under the common scheme or plan exception to establish that a sexual act occurred. *Id.*; *State v. Wermerskirchen*, 497 N.W.2d 235, 240-41 (Minn. 1993). In particular, if a defendant contends that a charge of criminal sexual conduct is a fabrication, *Spreigl* evidence is admissible to rebut that contention so long as the evidence is "sufficiently relevant to the charged crime." *Clark*, 738 N.W.2d at 346.

7

Our comparison of the testimony of J.T. and the testimony of J.B. reveals that the two witnesses described sexual abuse that was very similar. Each girl was a family member or relative of Beulah. Each girl was abused in Beulah's home when he typically was the only adult present or when other persons were in other areas of the home. Each girl was abused in Beulah's basement bedroom, a room where others were specifically excluded. Each girl's abuse escalated to Beulah's placing or rubbing his penis on the girl's vagina. Beulah used his familial authority over each girl to influence or threaten her into keeping the abuse a secret. In these ways, the sexual abuse of J.T. and J.B. share marked similarities in modus operandi. The facts of this case are comparable to *Kennedy*, in which the supreme court affirmed the admission of *Spreigl* evidence in a sexual-assault case to show common scheme or plan because the conduct in each situation was "nearly identical" and occurred in the same bedroom. 585 N.W.2d at 391.

Thus, the district court did not abuse its discretion when it determined that J.B.'s testimony is relevant to show that Beulah committed criminal sexual conduct against J.T. and J.B. according to a common scheme or plan. Because we conclude that the *Spreigl* evidence is relevant for that purpose, we need not consider whether the evidence is relevant for the other reasons asserted by the state.

**B.    Probative Value and Unfair Prejudice**

Beulah also contends that the district court erred by finding that the probative value of the state's *Spreigl* evidence substantially outweighs the potential for unfair prejudice. Specifically, he contends that the probative value of the *Spreigl* evidence was low and that

8

the state's *Spreigl* evidence was unfairly prejudicial because it "invit[ed] the jury to punish [him] for acts other than the offense charged."

In determining whether the probative value of *Spreigl* evidence outweighs its prejudicial impact, we balance the relevance of the evidence and "the State's need to strengthen weak or inadequate proof" against the risk that the evidence will be used as propensity evidence. *State v. Fardan*, 773 N.W.2d 303, 319 (Minn. 2009). In this case, the probative value was relatively high. As discussed above, the state's *Spreigl* evidence tended to show that Beulah committed criminal sexual conduct against both J.T. and J.B. according to a common scheme or plan. *See supra* part I.A. Beulah suggests that the state did not need to corroborate J.T.'s testimony with J.B.'s testimony because J.T.'s testimony alone was sufficient to prove the state's case. But Beulah acknowledges that there was no physical evidence of the alleged sexual abuse and that J.T. reported it years afterward. In addition, Beulah denied having any sexual contact with J.T., thereby implying that J.T. fabricated the accusation. For these reasons, the state's *Spreigl* evidence had significant probative value in light of the state's need to prove its case. *See Clark*, 738 N.W.2d at 346; *Kennedy*, 585 N.W.2d at 391-92; *Wermerskirchen*, 497 N.W.2d at 242; *State v. Rucker*, 752 N.W.2d 538, 550-51 (Minn. App. 2008), *review denied* (Minn. Sept. 23, 2008).

Beulah relies on *Ness*, in which the supreme court concluded that the state's *Spreigl* evidence that the defendant had sexually abused a child in the past was unfairly prejudicial. *Ness*, 707 N.W.2d at 689-91. But in *Ness*, the state's case was particularly strong, in part because the state had a credible eyewitness to the alleged abuse. *Id.* at 690-91. This case is distinguishable from *Ness* because the state had no such evidence. Rather, the

9

circumstances indicate that the state's need for J.B.'s testimony was not insubstantial. Furthermore, the possibility of unfair prejudice was lessened because the district court gave the jury two cautionary instructions about the permissible uses of the *Spreigl* evidence, immediately before the state presented the *Spreigl* evidence and again before the jury began deliberating. *See State v. Riddley*, 776 N.W.2d 419, 428 (Minn. 2009) (stating that courts "presume a jury follows a court's cautionary instruction"); *Kennedy*, 585 N.W.2d at 392 (reasoning that cautionary instructions concerning *Spreigl* evidence lessened probability of undue prejudice).

Thus, the district court did not abuse its discretion when it determined that the probative value of J.B.'s testimony evidence substantially outweighs the potential for unfair prejudice. Therefore, the district court did not err by granting the state's motion to admit its *Spreigl* evidence.

## II. Downward Dispositional Departure

Beulah also argues that the district court erred by denying his motion for a downward dispositional departure.

The Minnesota Sentencing Guidelines provide for a presumptive sentence for a felony offense. Minn. Sent. Guidelines II.C (2003). The presumptive sentence is "presumed to be appropriate for all typical cases sharing criminal history and offense severity characteristics." Minn. Sent. Guidelines app. (2003). Accordingly, a district court "shall utilize the presumptive sentence . . . unless the individual case involves substantial and compelling circumstances." Minn. Sent. Guidelines II.D. (2003); *see also State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981). If the district court departs from the presumptive

10

guidelines range, the district court is required to state the reason or reasons for the departure. Minn. Sent. Guidelines II.D. But if the district court does *not* depart, the district court is *not* required to state reasons for imposing a guidelines sentence. *State v. Johnson*, 831 N.W.2d 917, 925 (Minn. App. 2013), *review denied* (Minn. Sept. 17, 2013); *State v. Van Ruler*, 378 N.W.2d 77, 80 (Minn. App. 1985).

A district court may grant a downward dispositional departure from the presumptive guidelines range if a defendant has a "particular amenability to individualized treatment in a probationary setting." *State v. Trog*, 323 N.W.2d 28, 31 (Minn. 1982). In considering whether a defendant is particularly amenable to probation so as to justify a downward dispositional departure, a district court may consider, among other things, "the defendant's age, his prior record, his remorse, his cooperation, his attitude while in court, and the support of friends and/or family." *Id.* If the defendant requests a downward dispositional departure, the district court must "deliberately consider[]" the factors that are urged by a defendant in support of the motion. *State v. Mendoza*, 638 N.W.2d 480, 483 (Minn. App. 2002), *review denied* (Minn. Apr. 16, 2002). This court applies a very deferential standard of review to a district court's denial of a defendant's motion for a downward dispositional departure. *See State v. Bertsch*, 707 N.W.2d 660, 668 (Minn. 2006). This court will reverse such a decision only if the district court abused its discretion. *State v. Pegel*, 795 N.W.2d 251, 253 (Minn. App. 2011).

In this case, Beulah argued that a downward dispositional departure is appropriate because he has been law abiding since offending, was cooperative with the district court, has the support of family and friends, and has no conditional-release violations. Beulah

11

also argued that incarceration would not be suitable for him because he was 65 years old, in poor health, and suffering from cognitive deficits. The state opposed Beulah's motion and urged the district court to impose an executed sentence of 48 months of imprisonment, which was the presumptive guidelines sentence at the time of the offense. *See* Minn. Sent. Guidelines IV & V (2003). The state argued that Beulah is not amenable to probation because he has not accepted responsibility for the crime or apologized to J.T. and, thus, is unlikely to be rehabilitated in a probationary program.

At the beginning of the sentencing hearing, the district court stated that it had reviewed everything that had been submitted, which included a pre-sentence investigation report, a psychosexual-evaluation report, Beulah's memorandum of law, and numerous letters from relatives. During the sentencing hearing, the district court received victim-impact statements from J.T., J.T.'s mother, and J.B. The district court received an oral statement from C.T. in support of Beulah and allowed Beulah to make a personal statement.

At the conclusion of the sentencing hearing, the district court stated that it was "deeply impressed by both the testimony of [J.T.] and [J.B.]" and that "[i]t was clear . . . that the impact of that offense is deep and long-lasting." Addressing Beulah directly, the district court stated: "Despite all of the good that you have done in your life, I cannot find substantial and compelling reasons to depart. To do so would undervalue the criminality of the offense of which you have been convicted." These and other aspects of the record indicate that the district court "deliberately considered" the relevant factors and exercised its discretion when it denied Beulah's motion. *See Mendoza*, 638 N.W.2d at 483. No more

12

was required of the district court.  *See Johnson*, 831 N.W.2d at 925; *Van Ruler*, 378 N.W.2d at 80.

Beulah contends that the district court erred because it ignored the opinions stated in a psychosexual-evaluation report.  In that report, a psychologist recommended that Beulah participate in outpatient sex offender treatment.  Beulah's contention is inconsistent with the caselaw, which recognizes that a district court is not obligated to depart merely because a mitigating factor is present.  *See Bertsch*, 707 N.W.2d at 668; *Kindem*, 313 N.W.2d at 7-8; *Pegel*, 795 N.W.2d at 253-54.  This court recently reiterated that "the presence of factors supporting departure does not require departure." *State v. Abrahamson*, 758 N.W.2d 332, 337 (Minn. App. 2008), *review denied* (Minn. Mar. 31, 2009).  This case is similar to *Abrahamson*, in which the district court denied a motion for a downward dispositional departure despite a doctor's opinion that the defendant, who was convicted of criminal sexual conduct against a child, had a low risk of reoffending.  *Id.* at 335-36. The district court acknowledged that there was "some hope" for treatment of the defendant and that his lack of a criminal history supported a dispositional departure.  *Id.* at 336. Nonetheless, the district court emphasized the serious nature of the defendant's crime and the need for punishment by way of incarceration.  *Id.*  This court affirmed the denial of the motion for a downward dispositional departure.  *Id.* at 337.  Likewise, in this case, despite the presence of factors that might support a downward dispositional departure, the district court deliberately considered Beulah's arguments and exercised its discretion by concluding that a downward dispositional departure is inappropriate.  The only question

for this court is whether the district court abused its discretion, and we conclude that it did not do so.

Thus, the district court did not err by denying Beulah's motion for a downward dispositional departure.

**Affirmed.**