*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-2016**

State of Minnesota,
Respondent,

vs.

Edward James Lafore, Jr.,
Appellant.

**Filed December 1, 2025**
**Affirmed in part, reversed in part, and remanded**
**Bratvold, Judge**

Sherburne County District Court
File No. 71-CR-23-139

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Dawn R. Nyhus, Sherburne County Attorney, George R. Kennedy, Assistant County Attorney, Elk River, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Gina D. Schulz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Slieter, Presiding Judge; Bjorkman, Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

Appellant challenges the final judgments of conviction for second-degree aggravated robbery, illegal possession of a firearm, and third-degree assault. Appellant argues that three trial errors require reversal and a new trial: (1) the admission of the

victim's in-court identification violated his due-process rights; (2) the district court abused its discretion by admitting evidence of other acts as immediate-episode evidence; and (3) the prosecuting attorney committed prejudicial misconduct by misstating evidence during closing arguments. Appellant also contends that cumulative errors deprived him of a fair trial. Alternatively, appellant argues that Minn. Stat. § 609.035, subd. 1 (2022), bars the imposition of a sentence for his third-degree assault conviction.

We conclude that admitting the in-court identification evidence did not violate appellant's constitutional rights, there was no reasonable possibility that any erroneously admitted evidence of appellant's other acts influenced the verdict, and the prosecuting attorney did not misstate the evidence. But we also conclude that the third-degree assault offense was committed as part of the same behavioral incident as the second-degree aggravated robbery offense. Thus, we affirm in part, reverse in part, and remand for the district court to vacate the sentence for third-degree assault.

**FACTS**

In January 2023, respondent State of Minnesota filed a complaint charging appellant Edward James Lafore Jr. with second-degree aggravated robbery under Minn. Stat. § 609.245, subd. 2 (2022), illegal possession of a firearm under Minn. Stat. § 624.713, subd. 1(2) (2022), and third-degree assault causing substantial bodily harm under Minn. Stat. § 609.223, subd. 1 (2022), based on an incident in Elk River on January 22, 2023.[1]

_____

[1] The complaint also charged Lafore with simple robbery under Minn. Stat. § 609.24 (2022) and motor-vehicle theft under Minn. Stat. § 609.52, subd. 2(a)(17) (2022). Before jury selection, Lafore orally moved to add a sixth count, fifth-degree assault under Minn. Stat. § 609.224, subd. 1 (2022), as a lesser-included offense of third-degree assault. At Lafore's

The district court conducted a jury trial in July and August 2024. The jury found Lafore guilty of all counts. The district court imposed concurrent sentences of 60 months in prison for second-degree aggravated robbery and unlawful possession of a firearm and imposed a consecutive sentence of one year and one day for third-degree assault.

The following summarizes the trial evidence generally along with the evidence at issue on appeal.

*Accident, Assault, and Robbery*

Around 6:00 p.m. on January 22, 2023, B.J.K. was driving a sport utility vehicle (SUV) south on Highway 169 in Elk River when a pickup truck hit her from behind. B.J.K. pulled onto the shoulder and, in her rearview mirror, saw the pickup truck go into the ditch beside the road. B.J.K. placed a 911 call, which was visible on her SUV's center-console display. During the 911 call, the driver of the pickup truck (the assailant) approached B.J.K.'s SUV, they spoke through the driver's side window, and B.J.K. invited the assailant to sit in the passenger seat to get out of the cold, which he did. The assailant hung up the 911 call on the center-console display, stating, "I'm sorry. I can't get another DWI."

The assailant instructed B.J.K. to drive or get out of the SUV; she refused. The assailant then threatened to shoot B.J.K. and began to punch, hit, and bite her. The assailant unbuckled B.J.K.'s seatbelt and pushed her out of the SUV while he took the driver's seat. B.J.K.'s arm got caught in the seatbelt, and as the assailant accelerated, B.J.K. was dragged

---

sentencing hearing, the district court determined that the guilty verdicts for simple robbery, fifth-degree assault, and motor-vehicle theft were for lesser-included offenses and did not adjudicate them, citing Minn. Stat. § 609.04 (2022).

outside the SUV. B.J.K. freed herself and realized she had no phone; she walked to an underpass, where she laid down.

Another driver stopped to help B.J.K., and emergency responders arrived along with law enforcement.[2] B.J.K. "just started telling anybody who came . . . what happened, what [her assailant] looked like . . . . He was [in his] 50s, reeked of alcohol, [and had] a scruffy face, you know, red—red—reddish hair." A state trooper investigated the assailant's pickup truck, which was "[a] few car lengths" off the roadway, and saw a handgun on the truck's floor.

*B.J.K.'s Pretrial Statements Identifying the Assailant*

An officer from the Elk River Police Department (first officer) responded to the scene and learned the pickup truck was registered to Lafore's father, Edward Lafore Sr. (Lafore Sr.). B.J.K. was being treated in a nearby ambulance; at trial, B.J.K. described herself as "in shock." A second officer showed Lafore Sr.'s photo to B.J.K. and asked if she recognized him. She said she did not know, then started to cry and answered, "Yes." B.J.K. identified the man in the photo as her assailant.[3] B.J.K. testified that the photo "looked like the person but older, and he had, like, a handlebar mustache . . . . I didn't

---

[2] From the assault, B.J.K. suffered two cracked teeth; bleeding from a tooth that penetrated her lip; bruising and swelling on her forehead; scrapes on her back and the back of her head; concussion; vertigo; bruising of her ears; pain in her shoulder, back, sternum, and head; and cognitive difficulties, including short-term memory loss.

[3] The district court received as evidence the second officer's body-worn-camera video of B.J.K. identifying Lafore Sr.'s photo in the ambulance; the video was played for the jury.

remember the handlebar mustache, but the red hair, you know, kind of face, the eyes, nose, mouth were—were similar."

Law enforcement followed up on B.J.K.'s identification of Lafore Sr. A sergeant and a deputy from the Benton County Sheriff's Department went to Lafore Sr.'s home to investigate. Based on Lafore Sr.'s statements acknowledging that he owned the pickup and had a firearm and Lafore Sr.'s "shock" at learning his pickup was missing, the sergeant and deputy concluded that the pickup truck, as well as a firearm, had been taken without Lafore Sr.'s permission. After comparing Lafore's photo to B.J.K.'s description of the assailant, the investigating officers suspected that Lafore was the assailant.[4] The sergeant asked where Lafore might have gone; Lafore Sr. "said that the only place that he can think of is possibly" Lafore's aunt's home in north Minneapolis.

The day after the assault, a detective from the Elk River Police Department met with B.J.K. to take a statement and conducted a photo lineup, which was recorded.[5] The lineup

---

[4] Lafore Sr. told the sergeant that the door to his bedroom had been forced open and that spare keys to his truck and a "pistol" were missing. The deputy testified that Lafore Sr. told him that "he believed it would be Edward Lafore Jr." who took his truck and firearm. Earlier the same day, the sergeant had responded to a domestic dispute at Lafore Sr.'s house arising from a verbal argument between Lafore and Lafore Sr. over money. The sergeant testified that the dispute "was peacefully resolved and [law enforcement] left without incident."

At trial, Lafore Sr. testified that Lafore lived with him "off and on" but that he could not remember whether Lafore was living with him on January 22, 2023. Lafore Sr. also testified that other people he did not like sometimes stayed on his property, including one person who stole from him. He also agreed that Lafore drove his pickup truck "fairly regularly, but only on the property."

[5] The district court received as evidence the video recording of the photo lineup, and it was played for the jury.

was double-blind, meaning that the detective showing the photos did not know which photo was Lafore's. There were six photographs, and the detective showed them to B.J.K. one at a time. The detective instructed B.J.K. that "the person who committed the crime of robbery or assault may or may not be included" and that she "should not feel [that she had] to make an identification; it is just as important to clear innocent persons as it is to identify the guilty. Whether or not [she identified] someone, the investigation will continue."

The detective showed B.J.K. Lafore's photo as the second of the six photos. B.J.K. identified Lafore as her assailant, stating, "[T]hat looks like him . . . it's the mouth and the nose and the eyes." She rejected the other five photos. At the end of the lineup, B.J.K. stated that she was "very certain" of the identification. She added, "I mean, if I could smell him, I could probably give you a better identification, or if he talked, but that—that looks like the guy."

*Lafore and B.J.K.'s SUV Found in Minneapolis*

The assailant stole B.J.K.'s phone along with her SUV. Using a tracking application that shared the phone's location, B.J.K.'s daughter learned that the phone was near North Irving Avenue in Minneapolis at 7:02 p.m. on the evening of the assault and remained there until its battery died; she passed on this information to law enforcement. On the morning after the assault and at the request of the Elk River Police Department, a Minneapolis law-enforcement officer recovered B.J.K.'s SUV near the address relayed by B.J.K.'s daughter. The Minneapolis officer testified that the SUV was "right in front of" Lafore's aunt's home. B.J.K.'s phone and purse were not found.

As detailed below in our analysis, law enforcement learned that Lafore arrived at his aunt's house on January 25 and stayed there until he was arrested on February 5.

*DNA Evidence*

Law enforcement impounded B.J.K.'s SUV and swabbed it for DNA evidence; the DNA samples were forwarded to a forensic laboratory for analysis. The DNA analyst from the laboratory testified that she analyzed two swabs from the SUV—one taken from the steering wheel and the other from the gear shift—along with known DNA samples from B.J.K., Lafore, and Lafore Sr. The DNA analyst testified that the steering-wheel sample was "a mixture of three individuals," whom she identified as B.J.K., Lafore, and an "unknown unrelated individual." The DNA analyst added, "The major male profile matched Lafore . . . and did not match [B.J.K.] or Lafore Sr." The DNA analyst agreed that "major male profile" meant that "the most DNA that was in [the sample] belonged" to Lafore and that "the major profile would not be expected to occur more than once . . . in the world population." The DNA analysist testified to a similar conclusion about the gear-shift sample.[6]

---

[6] On the DNA analysis of the gear-shift sample, the DNA analyst testified that "[t]he major male profile matched [Lafore] and did not match [B.J.K.] or [Lafore Sr.]" and that "[t]he major profile would not be expected to occur more than once among unrelated individuals in the world population."

**DECISION**

**I.** **The district court did not err by denying Lafore's motion to exclude testimony from B.J.K. about the identity of her assailant.**

Before trial, Lafore moved to exclude "any in-court identification" by B.J.K., arguing that Lafore's photo in the photo lineup gave the "false impression that he may have reddish hair," B.J.K.'s identification of Lafore's photo was "shaky," and "[a]ny in-court identification . . . would be tainted by [B.J.K.'s] in-person observations of [Lafore] in court." After hearing arguments on Lafore's motion, the district court determined "specifically that it appears that the officers acted properly and the lineup itself, which is seen on the video, [was] not unnecessarily suggestive; and [the court would] allow [B.J.K.] to identify [Lafore] in open court if she is able to, subject to cross-examination." During B.J.K.'s testimony, the prosecuting attorney asked, "[D]o you see the person in the courtroom who got into the car with you?" In response, B.J.K. identified Lafore.

On appeal, Lafore does not challenge the admissibility of B.J.K.'s pretrial identification of Lafore as her assailant. Instead, he argues that the "out-of-court photo identification procedures . . . were impermissibly suggestive and created a risk of irreparable misidentification . . . . B.J.K. was particularly vulnerable to post-event manipulation because of the trauma of the assault and her memory disorder," and during pretrial hearings, B.J.K. "saw Lafore dressed in jail clothes and identified as the defendant in her case." Therefore, he argues, B.J.K.'s in-court identification of Lafore as her assailant was not "reliable and consistent with due process."

8

Appellate courts review a district court's evidentiary rulings for abuse of discretion, *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003), and this court has reviewed a district court's decision to admit identification evidence for abuse of discretion, *State v. Booker*, 770 N.W.2d 161, 168 (Minn. App. 2009) (citing *State v. Goar*, 295 N.W.2d 633, 634 (Minn. 1980)), *rev. denied* (Minn. Oct. 20, 2009). But when reviewing an appellant's due-process challenge to the admission of evidence resulting from a suggestive procedure, this court has reviewed the constitutional issue de novo. *State v. Hooks*, 752 N.W.2d 79, 83 (Minn. App. 2008).

The United States Constitution guarantees all criminal defendants due process of law. U.S. Const. amend. XIV. The United States Supreme Court has held that admission of identification evidence violates due process if, after considering the facts, the appellate court concludes that the pretrial identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Hooks*, 752 N.W.2d at 83-84. Due process may be violated by an in-court identification made "in the wake of a suggestive out-of-court identification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (holding that due process was not violated by admitting pretrial identification evidence, even though the procedure was suggestive); *see also Simmons*, 390 U.S. at 385-86 (holding that due process was not violated by admitting a witness's in-court identification after a pretrial photo lineup).[7]

---

[7] We acknowledge Lafore's argument that unreliable eyewitness misidentification possibly risks wrongful conviction. Lafore's brief to this court cites a dissent to make this point.

9

The Minnesota Supreme Court set out a two-step test, relying on United States Supreme Court caselaw, to determine whether the admission of identification evidence violated an appellant's due-process rights. *Ostrem*, 535 N.W.2d at 921. "The first inquiry focuses on whether the procedure was unnecessarily suggestive." *Id.* "When determining whether a photographic lineup was unnecessarily suggestive, we inquire whether the procedure used by the police influenced the witness identification of the defendant." *State v. Cruz-Ramirez*, 771 N.W.2d 497, 511 (Minn. 2009) (quotation omitted). The key factor is "whether the defendant was unfairly singled out for identification." *Id.* (quotation omitted).

"[U]nder the second prong of the test, the identification evidence, even if suggestive, may be admissible if the totality of the circumstances establishes that the evidence was

---

*Perry v. New Hampshire*, 565 U.S. 228, 263-64 (2012) (Sotomayor, J., dissenting) ("The empirical evidence demonstrates that eyewitness misidentification is the single greatest cause of wrongful convictions in this country."). Justice Sotomayor's dissent in *Perry* did not, however, suggest overturning the existing two-step test for evaluating identification evidence. Rather, Justice Sotomayor urged that courts should apply the two-step test for all suggestive identification procedures. *See id.* at 265 ("In my view, the ordinary two-step inquiry should apply, whether the police created the suggestive circumstances intentionally or inadvertently.").

At the request of the Minnesota Supreme Court, the evidence rules committee addressed proper procedures to promote reliable identification evidence. *See generally Report of the Minnesota Supreme Court Rules of Evidence Advisory Committee*, No. ADM10-8047 (Minn. Oct. 1, 2018), www.lrl.mn.gov/docs/2025/other/251008.pdf [https://perma.cc/YCC9-A7T9] (surveying scientific and legal developments around eyewitness identification and recommending best practices for Minnesota law-enforcement agencies and courts). Minnesota courts currently apply the two-step test and have incorporated the second step in a pattern jury instruction. *See* 10 *Minnesota Practice*, CRIMJIG 3.08 (2024) (providing similar reliability factors as in *State v. Ostrem*, 535 N.W.2d 916 (Minn. 1995)). We note that the pattern jury instruction was not used at Lafore's trial and that this is not challenged on appeal.

reliable." *Ostrem*, 535 N.W.2d at 921. To assess admissibility of the identification evidence, courts determine whether the identification had "an adequate independent origin, [and therefore] is considered reliable despite the suggestive procedures." *Id.* To make this determination, courts evaluate five factors:

> (1)     The opportunity of the witness to view the criminal at the time of the crime;
> (2)     The witness' degree of attention;
> (3)     The accuracy of the witness' prior description of the criminal;
> (4)     The level of certainty demonstrated by the witness at the photo display; [and]
> (5)     The time between the crime and the confrontation.

*Id.* The erroneous admission of an eyewitness identification does not require a new trial if the state can prove that the error was harmless beyond a reasonable doubt. *State v. Jones*, 556 N.W.2d 903, 913 (Minn. 1996).

Lafore argues that the pretrial identification procedures were unnecessarily suggestive in three ways. First, on the night of the assault, a law-enforcement officer showed B.J.K. a single photo of Lafore Sr. and "the image was . . . planted in her mind as the suspect the police had in mind." Lafore asserts that the photo of Lafore Sr. "looked a lot like Lafore." Second, none of the six photos in the lineup fit B.J.K.'s description of her assailant as a man "in his 50s with reddish hair and a scruffy face." The photo of Lafore "had a yellow or orange tint that was absent from the others" and which Lafore asserts "made reddish hair appear where there wasn't any" such that his photo resembled B.J.K.'s initial description. Third, Lafore argues that "B.J.K.'s vulnerabilities as a witness—her head injuries, her preexisting memory disorder, and her physical and emotional state at the

11

time of both identification procedures"—made her particularly susceptible to suggestive identification procedures.

The state counters that showing B.J.K. a photo of Lafore's father did not "single Lafore out for identification" because it was not Lafore's photo. The state also urges that the photo lineup "followed best practices" and that the photos used in the lineup showed men who were "reasonably similar" to B.J.K.'s description of her assailant. The state maintains that "the photo-lineup did not steer B.J.K. to identify Lafore."

We need not apply the first step and resolve the parties' arguments about the suggestiveness of the pretrial identification procedures. We assume without deciding that the pretrial identification procedures were unnecessarily suggestive and therefore turn to the second step of the applicable test. We consider each of the five factors in turn.

### A. B.J.K.'s Opportunity to View Her Assailant

In *State v. Lushenko*, this court determined that the first factor suggested identification evidence was reliable when a witness had a face-to-face conversation with a suspect during a burglary. 714 N.W.2d 729, 732 (Minn. App. 2006), *rev. granted* (Minn. July 19, 2006) *and ord. granting rev. vacated* (Minn. Dec. 12, 2006). The eyewitness in *Lushenko* spoke with the suspect, but "not [in] a lengthy exchange"—only long enough for the suspect to ask the eyewitness two brief questions before driving away. *Id.* On appeal, this court upheld the admission of the identification evidence. *Id*. at 730-31. Here, B.J.K. had a greater opportunity to view her assailant than the eyewitness in *Lushenko* did. B.J.K. and her assailant met eye to eye in her SUV; their interaction began with a conversation,

during which B.J.K. invited her assailant to sit in the SUV; this escalated into an argument and the assault. As Lafore concedes, this factor favors reliability.

## B. B.J.K.'s Degree of Attention

Lafore argues that this factor weighs against reliability based on B.J.K.'s emotional distress and head trauma from the accident and assault along with her preexisting memory disorder. The state responds that B.J.K. testified to details about her assailant's smell and the sound of his voice, showing "that she had heightened senses during this incident."

In *Ostrem*, the supreme court stated that, when a witness was "focused" as they conversed with the suspect, this factor weighs in favor of reliability. 535 N.W.2d at 922. In *State v. Adkins*, this court affirmed a conviction after determining that a district court's finding that a witness was "coherent, aware, and attentive during [their] observation of the intruder" supported its conclusion that an unnecessarily suggestive show-up identification "had adequate independent origin and there was not a substantial likelihood of irreparable misidentification." 706 N.W.2d 59, 63 (Minn. App. 2005).

Here, B.J.K. conversed with her assailant, and her testimony about the content of their conversation, his appearance and conduct, and the odor of alcohol all suggest that B.J.K. was focused during the encounter. On cross-examination, however, B.J.K. acknowledged that her emotional state was affected by the collision:

> Q: [I]t was so dramatic and quick you don't have a memory of exactly how you hit your head?
> A: I do not.
> . . . .
> Q: Got it. And so from that moment on, would you agree you were—distraught?
> A: Yes.

Q: Yeah. Even hysterical even, from what we heard on the—
A: Yeah.
Q: —call? Yeah.
A: Yes.
Q: And that was even before Mr. Lafore came into the car?
A: Yes.
Q: All from the accident; correct?
A: Yes.

B.J.K. also testified that she "had a really bad head injury" and that her memory of "smaller details" in the hours following the assault was "spotty."

Based on this record, B.J.K. was attentive during her interaction with the assailant, but she was also emotional, and her memory was uneven. We conclude that the second factor is neutral.

### C. Accuracy of B.J.K.'s Description of the Assailant

Lafore argues that B.J.K.'s initial identification of her assailant as having red hair— which Lafore does not have—means this factor weighs against reliability. In *Seelye v. State*, this court determined that the third factor favors reliability of identification evidence when it is "on the whole, accurate." 429 N.W.2d 669, 673 (Minn. App. 1988). In *Seelye*, a witness accurately described a suspect's clothing, facial features, complexion, hair, and weight but was mistaken about height and facial hair. *Id.* This court concluded that the identification had an adequate independent origin and affirmed the conviction. *Id.*

B.J.K.'s description of the assailant shows a similar level of accuracy as the witness's description of the suspect in *Seelye*. Although B.J.K. was wrong about the assailant's hair color, she accurately described her assailant's age, height, build, and clothing. As was the witness's description in *Seelye*, B.J.K.'s description was, "on the

14

whole, accurate." *Id.* This factor therefore favors the reliability of B.J.K.'s photo-lineup identification.

### D.    B.J.K.'s Certainty of Her Identification

During the photo lineup, B.J.K. viewed Lafore's photo second out of six photos. She identified Lafore as her assailant and rejected the other five photographs as they were shown to her one at a time. At the end of the lineup, she affirmed her identification and stated that she was "very certain" about it.

Lafore points out B.J.K.'s statements that she could provide a "better identification" if she could smell or hear the suspect, which Lafore contends undermines B.J.K.'s certainty about the identification. We disagree. B.J.K.'s acknowledgment that more information would bolster her identification of Lafore as her assailant does not reduce the certainty that she expressed about the photo lineup. In *Lushenko*, this court determined that the district court did not err in finding an adequate independent origin for the identification evidence when the witness was "90% certain" of their identification. 714 N.W.2d at 733. B.J.K.'s statements affirming her identification of Lafore during the lineup were comparable to the witness's certainty in *Lushenko*. Thus, this factor weighs in favor of reliability.

### E.    The Time Between the Assault and the Photo Lineup

B.J.K.'s identification of Lafore in the photo lineup occurred less than 24 hours after she was assaulted. In *Ostrem*, the supreme court determined that 48 hours between when a witness observed a suspect and when a witness made a photo identification of the suspect was short and favored reliability. 535 N.W.2d at 922; *see also Seelye*, 429 N.W.2d at 673 (finding that 12 days between a crime and photographic lineup was "reasonably prompt").

15

Here, less than 24 hours passed between B.J.K.'s assault and the photo lineup; therefore, this factor favors the reliability of the identification.

Lafore disagrees and argues that this factor weighs against reliability because "B.J.K. was still feeling the effects of the assault and . . . she had an evening to ruminate on the photo" of Lafore Sr. We are not persuaded by Lafore's argument for two reasons. First, we considered the assault's effects on reducing B.J.K.'s degree of attention in the second factor and the fifth factor considers how long between the assault and the photo lineup. Second, while viewing a photo of Lafore Sr. before the photo lineup may have been unnecessarily suggestive, this relates to the first step of the *Ostrem* test. Here, we have assumed that the pretrial identification procedures were unnecessarily suggestive. Thus, B.J.K.'s viewing Lafore Sr.'s photo does not impact our analysis of the fifth factor.

Because four of the five factors indicate that B.J.K.'s photo-lineup identification of Lafore had an adequate independent origin and was therefore reliable, the district court did not err in allowing B.J.K. to identify her assailant in court.

**II.    Any error in the admission of evidence of Lafore's conduct and arrest at his aunt's house in Minneapolis did not substantially influence the verdict.**

Before trial, Lafore moved under Minnesota Rule of Evidence 404(b) to exclude evidence of his conduct and arrest at his aunt's house. On the first day of trial, the district court heard the parties' arguments on the motion and denied it, as explained below.

During trial, the state called Lafore's aunt, who testified that Lafore arrived at her house and entered by kicking her door in and that she "was scared." She added that Lafore locked himself in a bathroom and refused to come out. The aunt called the police, who told

16

her to leave "for [her] safety," which she did. The aunt did not remember the date Lafore arrived at her house, but a Minneapolis police officer testified that it was on January 25, 2023—three days after the assault. The aunt remained away from her home for 12 days until Lafore's arrest on February 5, 2023.

Minneapolis police officers testified about Lafore's arrest at his aunt's house. Two officers testified to the details of the arrest, as summarized below. During trial, Lafore objected to the officers' testimony under rule 404(b) and relevance. The district court overruled both objections.

On appeal, Lafore argues that the district court abused its discretion in admitting testimony about his conduct and arrest at his aunt's house in Minneapolis. Lafore contends that the other-acts evidence was not properly noticed under rule 404(b)(2) and was irrelevant, cumulative, and unfairly prejudicial. The state contends that the evidence was admissible without notice as part of the same immediate episode as the charged crimes and that, thus, the evidence was relevant to establish Lafore's identity as the perpetrator.

As mentioned above, "evidentiary rulings rest within the sound discretion of the district court, and we will not reverse an evidentiary ruling absent a clear abuse of discretion." *State v. Ali*, 855 N.W.2d 235, 249 (Minn. 2014). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Guzman*, 892 N.W.2d 801, 810 (Minn. 2017). An appellant bears the burden of proving both error and prejudice. *State v. Loving*, 775 N.W.2d 872, 879 (Minn. 2009). A reviewing court "will reverse the district court's ruling if the error substantially influenced the jury's decision." *Id.*

Evidence must be relevant to be admissible. Minn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Relevant evidence may, however, be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403.

Evidence of "another crime, wrong, or act" is inadmissible "to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b)(1); *accord State v. Ness*, 707 N.W.2d 676, 685 (Minn. 2006).[8] Evidence of a defendant's other acts may, however, be admissible under the immediate-episode exception "where two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other." *State v. Riddley*, 776 N.W.2d 419, 425 (Minn. 2009) (quotation omitted). Under the immediate-episode exception, "[t]he state may prove all relevant facts and circumstances which tend to establish any of the elements of the

---

[8] Rule 404(b)(1) allows the admission of other-acts evidence for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This is commonly called "*Spreigl*" evidence. *Ness*, 707 N.W.2d at 682 (stating that "evidence of other crimes, wrongs, or acts" is "often referred to as *Spreigl* evidence"); *see State v. Spreigl*, 139 N.W.2d 167, 167 (Minn. 1965) (articulating a notice requirement for other-acts evidence). To admit other-acts evidence under rule 404(b)(1), the state must provide notice, and the district court must evaluate enumerated factors. Minn. R. Evid. 404(b)(2); *see also State v. Smith*, 9 N.W.3d 543, 561-64 (Minn. 2024) (applying a five-factor test). The state did not file a *Spreigl* notice or argue that evidence of Lafore's other acts was admissible for other purposes, and the district court did not analyze admissibility of the contested evidence under rule 404(b). We therefore do not consider the other purposes set out in rule 404(b) as a basis for admitting evidence of Lafore's conduct and arrest in Minneapolis.

offense with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes." *State v. Wofford*, 114 N.W.2d 267, 271 (Minn. 1962). The immediate-episode exception requires "a close causal and temporal connection between the prior bad act and the charged crime." *Riddley*, 776 N.W.2d at 426.

### A. Most of the challenged evidence was not part of the same immediate episode as the charged crimes.

As indicated, the district court denied Lafore's motion to exclude evidence of Lafore's conduct and arrest at his aunt's house. The district court ruled that the state was allowed to "introduce evidence consistent with the investigation" and "elicit testimony regarding the surrounding circumstances as to how and when [Lafore] was apprehended." The district court explained that "post-identification . . . [the evidence] provides the jury with a context in terms of furthering their investigation" and that, if screenshots from body-worn-camera footage taken during the arrest "relate[] to the identification, if it is consistent with identification, then [it would] allow the screenshot along with the testimony." The district court's ruling expressly allowed objections about the scope of the testimony.

During trial, Lafore objected under rule 404(b) to the following testimony from his aunt: "There was one time that he broke the door down . . . [and] I was scared." The district court overruled Lafore's objection during the aunt's testimony, explaining, "Let's hear a little bit more about the context of when this occurred and whether or not it was around the time period of January 22nd." The district court also overruled Lafore's rule 404(b) and

relevance objections to the testimony of two Minneapolis officers about details of Lafore's arrest on February 5, 2023.

On appeal, Lafore contends that the challenged evidence was not part of the same immediate episode because Lafore's acts at his aunt's house were distant in time from the crimes charged and there is no causal connection between the charges and his conduct at his aunt's house. Lafore argues that "the arrests do not help the state prove any elements of the charged offenses—they simply make Lafore look like the kind of person who might commit them." Lafore concedes that "*some* evidence relating to the location Lafore was found was likely admissible because it tended to link him to B.J.K.'s car and the location in which it was found." Still, Lafore urges that "the state did not need three witnesses" to testify to Lafore's other acts at his aunt's house.

The state counters that facts about Lafore's conduct and arrest in Minneapolis "were admissible as immediate-episode evidence because they are necessary to complete the narrative arc." The state argues that "[t]he connection required to admit immediate episode evidence does not demand perfect alignment between the charged offense and the other act."

The state's position is not persuasive. Admitting evidence as part of the immediate episode because it "complete[s] the narrative arc" would substantially broaden the immediate-episode exception. "Immediate-episode evidence is a *narrow* exception to the general character evidence rule." *Riddley*, 776 N.W.2d at 425 (emphasis added). The exception requires "a close causal and temporal connection" between immediate-episode

20

evidence and the charged crime—demanding that the evidence "tend[s] to establish . . . elements of the offense with which the accused is charged." *Id.* (quotation omitted).

A sufficient causal connection exists between immediate-episode evidence and a charged crime when the other acts motivated or facilitated the charged crime. *See id.* at 425-26 (surveying Minnesota cases on the admission of immediate-episode evidence). But even a close temporal connection may be insufficient to overcome the absence of a causal connection. *Id.* at 426-27 (concluding that evidence of a robbery that occurred 15 minutes before a charged crime was improperly admitted because "there [was] not a close causal connection between the charged offenses and the . . . robbery").

Some of the evidence offered by the state about Lafore's conduct and arrest at his aunt's house is not challenged and was properly admitted to prove his identity as the assailant. But the admitted evidence exceeded this relevant point. The state fails to articulate a causal connection between the charged crimes and Lafore kicking in his aunt's door, Lafore locking himself in the bathroom of his aunt's house, his aunt fearing for her safety and leaving her home when Lafore kicked in her door, or the details of Lafore's arrest. Also, there is no close temporal connection between the charged crimes and evidence of Lafore's conduct and arrest at his aunt's house. Lafore's other acts occurred between three and 11 days after the charged crimes. Thus, we conclude that the district court abused its discretion by admitting evidence beyond B.J.K.'s SUV being found near Lafore's aunt's home and Lafore staying at his aunt's home shortly after the crimes.[9]

---

[9] Although not mentioned by the state, some evidence that Lafore locked himself in the bathroom of his aunt's house and violated police commands to leave the house "for a pretty

**B.** **The erroneously admitted evidence did not significantly affect the verdict.**

When evidence is admitted in error, a reviewing court will generally reverse only when there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Bigbear*, 10 N.W.3d 48, 54 (Minn. 2024). Courts apply a nonexhaustive list of factors to determine the effect of wrongfully admitted evidence on a verdict, including "(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the evidence." *Id.* Also, "strong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Id.* (quotation omitted). In this review, appellate courts examine the entire record; the critical question is not whether other evidence is sufficient to sustain the verdict, but whether the wrongfully admitted evidence substantially influenced the verdict. *Id.*

Lafore argues that the challenged evidence substantially influenced the jury verdict because it was presented "in a highly persuasive and repetitive manner," the witnesses were

---

significant amount of time" was admissible as suggestive of Lafore's consciousness of guilt. "Flight before apprehension or after arrest and when on bail is a circumstance to be considered—not as a presumption of guilt, but as something for the jury—as suggestive of a consciousness of guilt; and the same is true of an attempt to escape or resisting arrest." *State v. McTague*, 252 N.W. 446, 448 (Minn. 1934).

In *McTague*, the supreme court determined that evidence of McTague's flight was generally admissible but "[t]he state offered evidence of flight at greater length than was necessary and went further than it should have gone" by providing extraneous details. *Id.* at 454. The supreme court, however, refused to reverse because McTague was not "substantial[ly] harm[ed]" by the evidence. *Id.* We similarly conclude that the state "went further than it should have gone" by presenting evidence of a detailed account of his aunt's fear and Lafore's arrest.

22

credible, the prosecuting attorney emphasized the evidence in closing remarks, and Lafore could not counter the evidence. The state responds that the contested evidence was not sufficiently prominent or persuasive to create a reasonable likelihood that it substantially influenced the jury's verdict and that, therefore, any error in its admission was harmless. We consider each *Bigbear* factor in turn.

### 1.    Manner Presented

This factor focuses on the prominence of the inadmissible evidence, both in terms of its relative volume within the state's case and the prosecuting attorney's emphasis on the evidence.[10] *See id.* at 56. The supreme court in *Bigbear* considered a video of the victim's interview with a social worker and investigator and held the video was improperly admitted at trial. *Id.* at 51. The contested evidence, as transcribed from the video, filled 12 pages of a 300-page transcript, did not include uncorroborated evidence of the defendant's guilt, and was not frequently emphasized by the prosecuting attorney. *Id.* at 56. The supreme court concluded that the manner in which the video was presented did not favor reversal. *Id.*

Here, the entirety of the evidence about Lafore's conduct and arrest at his aunt's house occupies about 28 pages of a 940-page trial transcript. And some of this evidence was admissible, as explained above. Lafore points out that the number of pages exceeded the length of B.J.K.'s testimony on direct examination. But because much of the 28 pages

---

[10] This factor overlaps somewhat with factor three, use of the evidence in closing argument, but focuses more broadly on the prominence of the inadmissible evidence throughout the state's case.

of challenged testimony contained preliminary questions and cross-examination, we conclude that the manner of presenting the contested evidence was not prominent and therefore weighs against a finding of prejudice.

### 2. Persuasive Value

In *Bigbear*, the supreme court determined that the improperly admitted video evidence "contained some persuasive value" when it made "the circumstances of the [charged crime] more conceivable," but this persuasive value was negated if there was properly admitted evidence proving the same element of the offense. *Id.* at 57. The video also included "inflammatory" "name-calling . . . character evidence" that the supreme court determined "undoubtedly had persuasive effect" and was inappropriately admitted. *Id.*

As Lafore concedes, some evidence that he was at his aunt's house in Minneapolis—and that his aunt's house was near where B.J.K.'s SUV was discovered— was admissible to prove his identity as the perpetrator. But we acknowledge that evidence that Lafore caused his aunt to be fearful and leave her home and details of Lafore's arrest may have persuaded jurors of Lafore's bad character. As with the video evidence in *Bigbear*, some of the challenged evidence here was admissible to prove an element—the assailant's identity. And as in *Bigbear*, other evidence unrelated to the events at the aunt's house also proved the assailant's identity. So while the evidence was persuasive on the element of identity and the inadmissible purpose of bad character, other evidence also proved identity. We conclude that this factor is neutral.

### 3. Use in Closing Argument

In *Bigbear*, the supreme court determined that this factor suggested the error was harmless because the prosecuting attorney referred to the inadmissible evidence nine times during closing arguments and did so for purposes that were "not inherently prejudicial or improper." *Id.* at 59. The prosecuting attorney's arguments were "only two paragraphs of the 19-page transcript of his closing and rebuttal arguments." *Id.* The supreme court added that, in all but one of these instances, the same facts were proved through alternative, proper means. *Id.*

Here, the prosecuting attorney referred to the inadmissible evidence four times, amounting to 16 lines of a 16-page transcript of closing and rebuttal arguments.[11] This is fewer references than in *Bigbear*. But three of the four references emphasized the harm to Lafore's aunt, who left her home to avoid Lafore. For example, the prosecuting attorney argued, "[The aunt's] door got kicked in by Edward Lafore Jr. where she had to leave her own home for her personal safety." Because the prosecuting attorney mentioned the inadmissible evidence during closing arguments to repeat prejudicial facts that are unrelated to the charged crimes, this factor somewhat supports finding that the error was prejudicial.

---

[11] The fifth instance cited by Lafore is the prosecuting attorney's statement: "We know that Edward Lafore kicks in doors. We heard that before, didn't we?" This statement does not refer to the aunt's house. There was unobjected-to testimony that Lafore kicked in a door at his father's home. The prosecuting attorney's statement occurs during an argument about Lafore's actions at his father's home.

### 4. Effectively Countered by the Defendant

In *Bigbear*, the supreme court explained that the fourth factor considers whether a defendant had the opportunity to cross-examine the witness offering the inadmissible evidence. *Id.* The supreme court determined the defendant did not effectively counter the inadmissible evidence because the scope of direct examination and witness's lack of memory about their statements in the video hindered cross-examination. *Id.*

Lafore had the opportunity to and did cross-examine the three witnesses who testified to his conduct and arrest at his aunt's house. Lafore argues that he could not effectively counter the other-acts evidence "because there was simply no way to do so. He did not deny that the arrest happened that way and had no explanation to give the jury." Lafore's argument is not convincing. The state identifies several ways in which Lafore's cross-examination actually countered the inadmissible evidence by emphasizing gaps in the state's timeline, eliciting evidence of an alternative perpetrator for the assault, and offering an alternative explanation for a jacket in the aunt's home that was purportedly similar to one B.J.K. described as worn by her assailant. We conclude that this factor suggests that any error was not prejudicial.

### 5. Strong Evidence of Guilt

"Strong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Bigbear*, 10 N.W.3d at 59 (quotation omitted). Unlike the previous four factors, which consider the entire record, this factor focuses exclusively on evidence of guilt. *Id.* at 60. In *Bigbear*, the supreme court summarized the properly admitted evidence of guilt and,

because it "was overwhelming against [the defendant]," concluded that "this very important factor weigh[ed] heavily in favor of finding that any error was harmless." *Id.*

Lafore contends that evidence of his guilt is not strong, relying on his argument that B.J.K.'s identification evidence was inadmissible. As discussed above, the identification evidence was properly admitted. When the identification evidence is considered alongside DNA evidence linking Lafore to B.J.K.'s SUV, the prejudicial effect of the inadmissible evidence is diminished. As a result, this factor suggests that any error was harmless.

Two of the four *Bigbear* factors indicate that any error was harmless—the manner of presentation by the state and the effective countering of the evidence by the defense—one factor is neutral, and one factor favors a finding of prejudicial effect. Because, along with the four factors, other strong evidence of Lafore's guilt was properly admitted, there is no reasonable possibility that the challenged evidence significantly affected the verdict.

III. **The portion of the prosecuting attorney's closing argument about a study on the secondary transfer of DNA was not misconduct.**

During closing argument and rebuttal, the prosecuting attorney argued that the DNA analyst's testimony on the secondary transfer of DNA was "irrelevant" to DNA evidence linking Lafore to B.J.K.'s SUV, urged the jury to "disregard that DNA study," and argued the study was "100 percent irrelevant" and "absolutely inappropriate." Lafore did not object to these remarks during trial. On appeal, Lafore argues that the prosecuting attorney misstated evidence and argued improper inferences and that, therefore, Lafore is entitled to reversal based on prosecutorial misconduct.

Unobjected-to prosecutorial misconduct is reviewed under a modified plain-error standard. *State v. Ramey*, 721 N.W.2d 294, 299-300 (Minn. 2006). Under *Ramey*, the appellant bears the burden of proving that an error occurred and that the error was plain. *Id.* at 302. Plain error is usually demonstrated by a showing the challenged conduct contravenes caselaw, a rule, or a standard of conduct. *Id.* If an appellant shows plain error, the burden shifts to the state to show there is "no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). "If these three prongs are satisfied, the court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.*

Lafore challenges the prosecuting attorney's remarks during closing and rebuttal arguments about the DNA analyst's testimony on the secondary transfer of DNA and the study referenced by Lafore's attorney. Before analyzing the challenged arguments, we summarize the relevant testimony.

During cross-examination, Lafore's attorney questioned the DNA analyst about primary and secondary transfer of DNA. The DNA analyst explained that primary transfer "would refer to me being a primary person touching [a] water bottle" and that secondary transfer would be "you then touching the water bottle and having my DNA . . . on you." Lafore's attorney emphasized secondary transfer of DNA, questioning the DNA analyst about a published study that examined the probability of secondary DNA transfer under controlled conditions. The DNA analyst acknowledged that she was familiar with the study

and agreed that the profiles created and tested in the study "had the potential to falsely link an individual to an item of evidence."[12]

On redirect, the DNA analyst agreed that the study was "completely irrelevant" to how the forensic laboratory performed its analysis of the DNA samples for this case. On recross-examination, the DNA analyst agreed that she was "not making any claim about how the DNA got into these samples in the vehicle."

During closing arguments, the prosecuting attorney urged that "[the jury] should disregard that DNA study," and during rebuttal, the prosecuting attorney again argued that the study was irrelevant:

> Also, I wonder why we are bringing up that test—or that—that—that DNA case where it says 20 percent of the transfer or whatever, where the scientist who tested these samples said *that study was 100 percent irrelevant*. It didn't have anything to do with what—how it is that she analyzed. *It's old data. It—it's irrelevant.* It doesn't have anything to do with how she tested DNA.
>
> Why? Why do we go back and bring up something like 20 percent of the transfer, which is *absolutely inappropriate evidence* because how else do you explain, ladies and gentlemen, how else do you explain that Edward Lafore Jr.'s DNA is on that steering wheel, is on that gear shift and wouldn't be expected to occur more than once in the world population. Just him. Nobody else. Just him.

(Emphasis added.)

---

[12] Lafore's attorney introduced the parameters of the study by asking detailed questions of the DNA analyst. In his questions, Lafore's attorney described the study: The study involved 24 pairs of participants; each pair shook hands for two minutes; one member of the pair then picked up an object which was later swabbed for DNA. In five of the 24 samples, the major DNA profile came from the person who had not picked up the object.

Lafore contends that this argument misstated evidence and misled the jury, arguing that characterizing the study as "irrelevant" was misleading because "secondary transfer was relevant." Lafore argues this unfairly undercut his theory that Lafore's DNA could have accumulated in Lafore Sr.'s truck and "ended up in B.J.K.'s car by secondary transfer," claiming that no testimony contradicted that theory.[13]

Lafore also argues that the prosecuting attorney misstated evidence by calling the study "old data"; Lafore contends that no other evidence suggests that more recent research contradicts the study's findings. Lafore concludes that the prosecuting attorney misled the jury by implying that the presence of Lafore's DNA in B.J.K.'s SUV necessarily meant that Lafore had been in the SUV. Finally, Lafore maintains that the prosecuting attorney's misconduct warrants reversal because it "almost certainly confused the jury on a difficult point of DNA science."

The state counters that, in the context of the entire closing statement, the remarks about the secondary-transfer testimony did not misstate evidence or mislead the jury. The state focuses on the DNA analyst's testimony on redirect that the study was "completely irrelevant" to her own DNA analysis. The state also contends that it was reasonable to infer that secondary transfer was an unlikely source of Lafore's DNA in B.J.K.'s SUV.

---

[13] During closing argument by Lafore's attorney, he argued, "Whoever was driving [the pickup truck] came from [Lafore Sr.'s] household . . . . Imagine the opportunities for transfer of DNA between that vehicle and [B.J.K.'s] vehicle . . . . You heard from [the DNA analyst], after we went through that study, that secondary transfer is not only possible, it's common."

When analyzing prosecutorial misconduct during closing arguments, appellate courts consider the argument as a whole. *State v. McCray*, 753 N.W.2d 746, 751 (Minn. 2008). It is improper for a prosecuting attorney "intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." *State v. Smith*, 876 N.W.2d 310, 335 (Minn. 2016) (quotations omitted). But the prosecuting attorney may "argue all reasonable inferences from the record." *Id.*

We conclude that the challenged arguments attempt to persuasively frame the evidence and do not misstate it. The prosecuting attorney did not make any arguments inconsistent with the DNA analyst's testimony. The prosecuting attorney asserted that secondary transfer was irrelevant to the DNA analysis performed by the forensic laboratory. This is consistent with the DNA analyst's testimony:

> Q:  And so I'm going to ask you again. Based on what your procedure is, is this study pretty irrelevant?
> A:  Yes.

Lafore is correct that some of the DNA analyst's testimony about secondary transfer allowed his attorney to argue by inference that Lafore's DNA was transferred to B.J.K.'s SUV by an unknown third person who stole Lafore Sr.'s truck, which Lafore had used many times. But this does not make the prosecuting attorney's inference—that the DNA evidence tends to prove that Lafore was the assailant—misleading. *See id.* (stating that a prosecuting attorney may argue all reasonable inferences and must not mislead the jury as to the inferences it may draw).

The prosecuting attorney also argued that secondary transfer did not apply after eliciting testimony from the DNA analyst to distinguish the study from the circumstances

31

required for Lafore's DNA to end up in B.J.K.'s SUV through secondary transfer. Specifically, the prosecuting attorney asked, "[I]n this case, are we talking about people who were . . . shaking hands for 20 seconds at a time?"[14] The DNA analyst replied, "I don't know what they were doing. I just have the samples."

Finally, the prosecuting attorney's remark that the study was "old data" does not misstate evidence. The state's argument "must be based on the evidence produced at trial, or the reasonable inferences from that evidence," but it "need not be colorless." *State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995) (quotation omitted). Describing a 2016 study as "old" is mere argument and within the bounds of acceptable conduct by a prosecuting attorney. After reviewing the prosecuting attorney's statement as a whole, we conclude that the remark about "old data" did not "have the effect of materially undermining the fairness of a trial." *Smith*, 876 N.W.2d at 334-35.

Because the prosecuting attorney did not misstate the evidence, and because the inferences argued were reasonable and had support in the record, there was no prosecutorial misconduct. Therefore, we need not consider the parties' arguments on whether misconduct affected Lafore's substantial rights or whether it undermined the fairness and integrity of the proceedings.

---

[14] Actually, Lafore's attorney described the study as involving a "two-minute" handshake between participants. So the prosecuting attorney understated the difference between the study and the circumstances for secondary transfer of Lafore's DNA.

**IV.     Cumulative errors did not deprive Lafore of a fair trial.**

Lafore argues that the cumulative effect of multiple errors denied him a fair trial requiring reversal. Lafore contends that the three asserted trial errors—suggestive photo lineups, other-acts evidence, and misstatement of exculpatory DNA evidence—are mutually reinforcing because they all erroneously strengthened the state's argument on the central question of the perpetrator's identity.

We determined that there was no error in the admission of identification evidence, that some evidence of Lafore's conduct and arrest at his aunt's house was erroneously admitted but the error was harmless, and the prosecuting attorney did not commit misconduct during closing argument. Thus, there are not multiple errors to accumulate. *Cf. State v. Bustos*, 861 N.W.2d 655, 663 (Minn. 2015) (identifying separate errors before analyzing whether cumulative error "had a significant effect on the verdict"). We conclude that Lafore is not entitled to a new trial because of cumulative error.

**V.      The district court erred by sentencing Lafore for third-degree assault.**

Lafore argues that the robbery and assault were part of the same behavioral incident and that, therefore, his sentence for third-degree assault must be vacated. Under Minnesota Statutes section 609.035, subdivision 1, except under circumstances that do not apply here, "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses." The supreme court has explained that "the law generally prohibits multiple sentences, even concurrent sentences, for two or more offenses that were committed as part of a single behavioral incident." *State v. Bakken*, 883 N.W.2d 264, 270 (Minn. 2016) (quotation omitted) (describing the application of an

identical version of Minn. Stat. § 609.035, subd. 1). "Whether [a] sentence violates section 609.035 is a question of law that [appellate courts] review de novo." *State v. Branch*, 942 N.W.2d 711, 713 (Minn. 2020). If a district court imposes multiple sentences in violation of section 609.035, subdivision 1, the reviewing court may "reverse the sentence imposed for [the lesser offense] and remand to the district court with instructions to vacate that sentence." *State v. Jones*, 848 N.W.2d 528, 538 (Minn. 2014).

"In order to determine whether two intentional crimes are part of a single behavioral incident, we consider factors of time and place and whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective." *State v. Bauer*, 792 N.W.2d 825, 828 (Minn. 2011) (quotation omitted). "The application of this test depends heavily on the facts and circumstances of the particular case." *Id.*

Lafore argues that "[t]here was a unity of time and place" between the robbery and the assault because both "happened during a short period of time in B.J.K.'s car on January 22, 2023." Lafore also argues that the assault was the means of committing the robbery, i.e., of "carrying away" B.J.K.'s SUV, and that, therefore, both crimes were motivated by the same criminal objective.

The state responds that Lafore already had control of B.J.K.'s SUV and had completed the robbery when B.J.K. was assaulted by being dragged along the road. Because Lafore had achieved the criminal objective of the robbery, the state concludes that the assault was committed with a new criminal objective.

We agree with Lafore. First, the robbery and assault committed by Lafore are not divisible by time and place and are therefore part of the same behavioral incident. In *State*

*v. Hawkins*, the supreme court addressed analogous facts. 511 N.W.2d 9 (Minn. 1994). Hawkins attacked an undercover narcotics agent and tried to rob him. *Id.* at 11. In the ensuing fight, Hawkins tried to take the agent's gun, which supported the jury's finding of guilt for attempted murder. *Id.* The supreme court determined that both the robbery and attempted murder were part of the same behavioral incident because they occurred "at about the same time in the same place." *Id.* at 13. And the supreme court concluded that multiple sentences were precluded under section 609.035. *Id.*

Second, the robbery and assault committed by Lafore had the same criminal objective. "In assessing whether the crimes were committed with the same criminal objective, we have examined the relationship of the crimes to each other." *Bauer*, 792 N.W.2d at 829. Courts should consider "whether all of the acts performed were necessary to or incidental to the commission of a single crime and motivated by an intent to commit that crime." *Bakken*, 883 N.W.2d at 271 (quoting *State v. Krampotich*, 163 N.W.2d 772, 776 (Minn. 1968)).

Lafore's criminal objective was to steal B.J.K.'s SUV by using threats and force. He assaulted B.J.K. while she was in the SUV, as he pushed her out of the SUV, and as he dragged her when driving away. Even after Lafore had control of the SUV, dragging B.J.K. was incidental to the same criminal objective—stealing her SUV.

Based on unity of time, place, and criminal objective, we conclude that the assault and robbery were part of the same behavioral incident. Therefore, under section 609.035, subdivision 1, Lafore cannot be sentenced for both offenses. We accordingly reverse and

remand to the district court with instructions to vacate appellant's sentence for third-degree assault.

**Affirmed in part, reversed in part, and remanded.**